**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**MEREDITH & SONS LUMBER COMPANY,
INC., and COASTAL PRODUCTS PLUS,
L.L.C.**

  **Plaintiffs,**

v.              **Case No. 3:04CV283/RV**

**WEYERHAEUSER COMPANY,**

  **Defendant.**

_____

**ORDER**

  Plaintiffs Meredith & Sons Lumber Company, Inc. ("Meredith") and Coastal Products Plus, L.L.C. filed a complaint in this court against the Weyerhaeuser Company ("Weyerhaeuser") based on purported violations of an exclusivity agreement between Weyerhaeuser and Meredith. On April 1, 2005, Weyerhaeuser filed a motion for partial summary judgment, asking the court to determine whether a 2004 agreement between Weyerhaeuser and Advanced Environmental Recycling Technologies, Inc. ("A.E.R.T.") terminated this exclusivity agreement. (Doc. 64). Plaintiffs have now filed their own motion for partial summary judgment on this issue. (Doc. 125). Unless otherwise noted, the following facts appear to be undisputed.

**I.  FACTUAL BACKGROUND**

  A.E.R.T. is a manufacturer of products which are a composite of wood fibers and various plastics and have uses similar to traditional lumber materials. In the mid-

1990s, A.E.R.T. sought the aid of Weyerhaeuser in distributing certain weather resistant composite decking products it had developed. Weyerhaeuser had a distribution network throughout the United States. In May of 1995, A.E.R.T. and Weyerhaeuser entered into an agreement ("1995 A.E.R.T./Weyerhaeuser agreement"), under which Weyerhaeuser agreed to market and sell A.E.R.T.'s composite decking materials under the "ChoiceDek" brand name. Weyerhaeuser agreed to buy its decking materials exclusively from A.E.R.T., and A.E.R.T. agreed to sell its line of decking products exclusively to Weyerhaeuser, subject to a few exceptions. The 1995 A.E.R.T./Weyerhaeuser agreement was scheduled to continue from year to year, running from January 1st to December 31st, unless one of the parties gave timely notice of termination.

Weyerhaeuser apparently marketed its ChoiceDek line of products through sub-distributorship agreements with local retailers. In April of 2000, Weyerhaeuser entered into such an agreement with Meredith ("Weyerhaeuser/Meredith agreement"). Meredith agreed to buy its decking products exclusively through Weyerhaeuser, in exchange for which Meredith was made the exclusive sub-distributor of A.E.R.T. composite decking products for the Florida panhandle west of Highway 231. The Weyerhaeuser/Meredith agreement was explicitly conditioned on the continued existence of Weyerhaeuser's distributorship agreement with A.E.R.T., and contained the following termination clause:

> [2.1] The parties acknowledge and agree that the availably of Product hereunder is dependent upon the continued existence of the Distributorship Agreement [between A.E.R.T. and Weyerhaeuser], and that if, for any reason, said Distributorship Agreement is terminated or if said Distributor Agreement is changed to prohibit the continuation of the Sub-Distributorship created herein, this Agreement shall likewise thereupon terminate.
> [2.2] For the purposes of this Agreement, Products shall be defined as all decking materials and decking accessories manufactured, or to be manufactured, by A.E.R.T., and for which Weyerhaeuser is the exclusive

distributor.[1]
(Doc. 64, attach. 2, at 2).

Termination of the Weyerhaeuser/Meredith agreement was also contemplated by paragraph 3.1 of the agreement, which stated:

> 3.1 This Agreement shall become effective as of the date hereof and shall extend for a primary term ending December 31, 2000, and from year to year thereafter unless and until terminated by either party upon no less than ninety (90) days prior written notice to the other party of such termination. Notwithstanding anything stated in this Agreement to the contrary, Weyerhaeuser shall not terminate this Agreement so long as Meredith: (1) Maintains in stock all available and marketable Product; (2) Continues to advertise said Product within its exclusive area; (3) Attends at least three (3) local Product trade shows each year; and (4) Purchases a minimum twenty-two (22) truckloads of the said Product each calender year.

(Doc. 64, attach 2, at 2).

The "ChoiceDek" products were well received by customers, and sales were good. Later, Weyerhaeuser began negotiations with Lowe's to distribute Weyerhaeuser's ChoiceDek products through Lowe's national network of Home Center stores. In anticipation of this new distribution plan, Weyerhaeuser modified its agreement with A.E.R.T. on December 21, 2001. The new agreement ("2001 A.E.R.T./Weyerhaeuser agreement"), increased A.E.R.T.'s expected output requirements for ChoiceDek products and added detail to the 1995 A.E.R.T./Weyerhaeuser agreement, but did not alter the exclusivity arrangement between A.E.R.T. and Weyerhaeuser.

In 2002, Weyerhaeuser agreed to a sub-distributorship arrangement with Lowe's which gave Lowe's the exclusive rights to a "Premium" line of ChoiceDek products.[2]

---

[1] Due to what appears to be a typographical error, these paragraphs are labeled 1.1 and 1.2 despite the fact that they appear in section 2 of the agreement. For purposes of clarity, I will refer to them in this motion as paragraphs 2.1 and 2.2.

[2] At that point, Weyerhaeuser's ChoiceDek products were divided into three product lines: Classic, Plus, and Premium.

Because Lowe's operated stores within the Florida panhandle west of Highway 231, Weyerhaeuser simultaneously negotiated an Addendum to the Weyerhaeuser/Meredith agreement that specifically recognized Weyerhaeuser's new Lowe's relationship within Meredith's sub-distributorship area. The Addendum allowed Weyerhaeuser to sell ChoiceDek products to Lowe's, and acknowledged that Lowe's would have exclusive rights on the "Premium" line of ChoiceDek products. In consideration for this, Weyerhaeuser was to pay Meredith a 17% commission on the gross sales of A.E.R.T. products sold to Lowe's stores.

Due to the increased demand for A.E.R.T.'s decking products, A.E.R.T. expanded its output and soon was producing more of its composite decking materials than Weyerhaeuser was able to sell. Thus, in June of 2003, A.E.R.T. entered into negotiations with Weyerhaeuser to alter its existing distributorship to allow A.E.R.T. to sell its decking products to others. These negotiations culminated in an agreement ("2004 A.E.R.T./Weyerhaeuser agreement") which significantly changed the terms of the 2001 A.E.R.T./Weyerhaeuser agreement. In the new agreement, Weyerhaeuser contracted to continue to exclusively obtain decking products and accessories for resale to Lowe's from A.E.R.T., but A.E.R.T. was also permitted to sell its decking products through other companies, and Weyerhaeuser was no longer the exclusive distributor of A.E.R.T. products. Weyerhaeuser was also no longer required to buy all of its composite decking products from A.E.R.T. The 2004 A.E.R.T./Weyerhaeuser agreement states that it was intended "to terminate... and replace" the A.E.R.T./Weyerhaeuser 2001 agreement. (Doc. 64, attach. 5, at 1) The 2004 A.E.R.T./Weyerhaeuser agreement indicates that it was intended to commence on January 1, 2004, but it was not signed by Weyerhaeuser until August 23, 2004, and was not signed by A.E.R.T. until October 5, 2004.

In August of 2004, Meredith contends it learned that Lowe's was selling A.E.R.T. decking products which, while labeled "Premium", were actually a new

product line. Weyerhaeuser, by contrast, contends that the product sold to Lowe's was simply an upgraded version of the "Premium" product, marketed under the same name. On August 7, 2004, Meredith placed an order with Weyerhaeuser for various A.E.R.T. products and supplies, including the purportedly new product. Weyerhaeuser refused to fill the order, telling Meredith that it had entered into an exclusive arrangement with Lowe's for the ordered products. The Plaintiffs subsequently filed suit in this court against Weyerhaeuser and Lowe's, alleging claims for breach of contract, and tortious interference with contract.[3]

## II. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc.,

---

[3] Defendant Lowe's was dismissed as a party in the case on November 22, 2004.

*Case No: 3:04cv283/RV*

477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

### B. The Termination Clause

The Plaintiffs' and the Defendant's motions for summary judgment each turn on the correct legal interpretation of a different provision in the Weyerhaeuser/Meredith agreement. When interpreting a contract, the intent of the parties governs. Bal Harbour Shops v. Greenleaf & Crosby Company, 274 So.2d 13 (Fla. 3rd DCA 1973). However, the best possible evidence of the intent of the parties is the language used in the contract itself. Jerry's, Inc. v. City of Miami, 591 So.2d 1000 (Fla. 3rd DCA 1991). A court must give the words and phrases used in a contract their plain and ordinary meaning unless there is some reason to believe they were used in a different sense. J.N. Lalitotis Engineering Construction v. Mastor, 558 So.2d 67 (Fla. 2nd DCA 1990). If the terms of a written instrument are disputed and are reasonably susceptible to more than one construction, an issue of fact is presented. Zarranz v. Coral Gables Hospital, 591 So.2d 323 (Fla. 3rd DCA 1991).

Weyerhaeuser's motion for summary judgment relies on paragraph 2.1 of the Weyerhaeuser/Meredith agreement, which states that:

> The parties acknowledge and agree that the availability of [A.E.R.T. products] hereunder is dependent upon the continued existence of the Distributorship Agreement [between Weyerhaeuser and A.E.R.T.], and that if, for any reason, said Distributor Agreement is terminated or if said Distributorship Agreement is

>changed to prohibit the continuation of the Sub-Distributorship created herein, this Agreement shall likewise thereupon terminate.

(Doc. 64, attach. 2, at 2).

Weyerhaeuser argues the "for any reason" language should be read to mean that the fact the A.E.R.T./Weyerhaeuser agreement is terminated is alone sufficient to effect a termination of the Weyerhaeuser/Meredith agreement, regardless of the circumstances surrounding the termination. The use of the phrase "for any reason" in a termination clause ordinarily implies an absence of any limitation or qualification on the power to terminate. See Corenswet v. Amana Refrigeration, 594 F.2d 129, 135 (5th Cir. 1979); Terranova v. 1550 Biscayne Associates, 847 So.2d 529, 532 (Fla. 3rd DCA 2003) ("The listing agreement clearly permitted either party to terminate this agreement 'for any reason whatsoever.' We construe this to mean that either party was free to cancel this agreement for good cause, bad cause, or no cause.") There is nothing in the Weyerhaeuser/Meredith agreement to suggest that the "for any reason" language was used in anything other than its ordinary sense. The plain meaning of paragraph 2.1, therefore, is that the Weyerhaeuser/Meredith agreement was dependent upon the continued existence of the exclusivity agreement between Weyerhaeuser and A.E.R.T.

Nevertheless, this does not settle the question of whether the distributorship agreement referenced by the Weyerhaeuser/Meredith agreement was terminated by the 2004 A.E.R.T./Weyerhaeuser agreement. The termination clause refers simply to the "continued existence of the Distributorship Agreement," (Doc. 64, attach. 2, at 2) which is defined elsewhere in the Weyerhaeuser/Meredith agreement as "a certain agreement between Weyerhaeuser and the said A.E.R.T." (Doc. 64, attach. 2, at 1) Taken in isolation, the reference to "the Distributorship Agreement" in this provision could be taken to refer only to the 1995 A.E.R.T./Weyerhaeuser agreement. However, such an interpretation of paragraph 2.1 is problematic for a number of reasons.

If the "Distributorship Agreement" referred to in paragraph 2.1 referred strictly to the 1995 A.E.R.T./Weyerhaeuser agreement, the Weyerhaeuser/Meredith

agreement would have terminated in 2001, when the 2001 A.E.R.T./Weyerhaeuser agreement replaced the 1995 A.E.R.T./Weyerhaeuser agreement, and not in 2004, when the 2004 A.E.R.T./Weyerhaeuser agreement replaced the 2001 A.E.R.T./Weyerhaeuser agreement. If this was the parties' intent, it is curious that they continued to act in accordance with the Weyerhaeuser/Meredith agreement long after it had obviously terminated. The fact that Weyerhaeuser did not recognize a 2001 termination does not, by itself, mean Weyerhaeuser has now waived enforcement of the termination provision. See Corenswet, supra, 594 F.2d at 136 (holding that the reserved power to terminate a contract cannot be lost through non-use). Still, a court may look to past conduct by the parties in interpreting provisions of a contract if the contract fails to define the parties' duties with certainty. Reinhardt v. Reinhardt, 131 So.2d 509 (Fla. 3rd DCA 1961). In this case, the parties' conduct weighs against a strict reference interpretation of paragraph 2.1.

  In addition to the actions of the parties, there is evidence in the text of the Weyerhaeuser/Meredith agreement that goes against a strict reference interpretation of paragraph 2.1. After stating that the Weyerhaeuser/Meredith agreement was dependant on the continued existence of the Weyerhaeuser/A.E.R.T. distributorship agreement, paragraph 2.1 goes on to state that the Weyerhaeuser/Meredith agreement will also terminate "if the said Distributorship Agreement is changed to prohibit the continuation of the Sub-Distributorship created herein." Clearly, this provision anticipates that some changes to Weyerhaeuser's distributorship agreement with A.E.R.T. could be made without terminating the Weyerhaeuser/Meredith agreement. In interpreting a contract, courts should avoid constructions that would render provisions of an agreement irrelevant or meaningless. See Excellsior Insurance v. Pomona Park Bar and Package Store, 369 So.2d 938 (Fla. 1979). The most reasonable construction of paragraph 2.1, therefore is that the sales arrangement with Meredith for ChoiceDek products depended upon: (1) an ongoing distributorship relationship with A.E.R.T., and (2) that nothing in the A.E.R.T. distributorship

agreement prohibited the continuation of the Meredith arrangement. The Defendant's interpretation of the termination language cannot mean, as a matter of law, that any post-1995 agreement between A.E.R.T. and Weyerhaeuser triggered termination of the Weyerhaeuser/Meredith agreement.

Perhaps sensing the weakness of this interpretation, Weyerhaeuser argues that the 2004 A.E.R.T./Weyerhaeuser agreement represented such a radical change in the relationship between Weyerhaeuser and A.E.R.T. that, on any plausible reading of paragraph 2.1, the Weyerhaeuser/Meredith agreement must terminate. According to Weyerhaeuser, the 2004 A.E.R.T./Weyerhaeuser agreement fundamentally altered the nature of the distributorship between Weyerhaeuser and A.E.R.T. by eliminating the exclusive character of the arrangement. The Weyerhaeuser/Meredith agreement does provide that "the availability of Product hereunder is dependant upon the continued existence of the Distributorship Agreement" between Weyerhaeuser and A.E.R.T. (Doc. 64, attach. 2, at 2) "Product" is defined, in turn, as "all decking materials and decking accessories manufactured or to be manufactured, by A.E.R.T., and for which Weyerhaeuser is the exclusive distributor." (Doc. 64, attach. 2, at 2) (emphasis added). Thus, Weyerhaeuser argues that a conversion to a non-exclusive distributorship with A.E.R.T. is, alone, all that is necessary to terminate the Weyerhaeuser/Meredith agreement.

Weyerhaeuser's reading of the contract provision is plausible. Nevertheless, there are unresolved factual issues with respect to whether Weyerhaeuser is no longer the exclusive distributor of ChoiceDek products. While the 2004 A.E.R.T./Weyerhaeuser agreement purports to end any exclusivity arrangement between Weyerhaeuser and A.E.R.T. regarding the composite decking products, there appears to be a remaining de facto exclusivity arrangement between Weyerhaeuser and A.E.R.T. regarding "ChoiceDek" products. Under both the 1995 and the 2004 A.E.R.T./Weyerhaeuser agreements, it appears that Weyerhaeuser is the only entity authorized to sell products under the ChoiceDek brand name. It is not clear from the

record whether A.E.R.T. could, consistent with the 2004 A.E.R.T./Weyerhaeuser agreement, sell decking products identical to ChoiceDek to other distributors for sale under another brand name. Nor is it clear whether Weyerhaeuser could distribute products purchased from someone other than A.E.R.T. under its ChoiceDek brand. In short, it appears from the present record that Weyerhaeuser may have a continuing exclusive agreement with A.E.R.T. as to the ChoiceDek products. While these are by no means the only genuine issues of material fact presented in this case, they are sufficient to prevent me from concluding as a matter of law that the exclusivity changes in the 2004 A.E.R.T./Weyerhaeuser agreement terminated the Weyerhaeuser/Meredith agreement.

Plaintiffs' motion for summary judgment relies on a different provision of the Weyerhaeuser/Meredith agreement to argue that it could not have been terminated by the 2004 A.E.R.T./Weyerhaeuser agreement. The provision in question, found in paragraph 3.1, states that

> Notwithstanding anything stated in this Agreement to the contrary, Weyerhaeuser shall not terminate this Agreement so long as Meredith: (1) Maintains in stock all available and marketable Product; (2) Continues to advertise said Product within its exclusive area; (3) Attends at least three (3) local Product trade shows each year; and (4) Purchases a minimum twenty-two (22) truckloads of the said Product each calender year.

(Doc. 64, attach 2, at 2).

According to the Plaintiffs, this language qualifies and overrides the "for any reason" language in paragraph 2.1, and prevents the termination of the Weyerhaeuser/Meredith agreement so long as the listed conditions are met. Since it is undisputed that Meredith has consistently met the four requirements of paragraph 3.1, the Plaintiffs argue that the 2004 A.E.R.T./Weyerhaeuser agreement cannot have served to terminate the Weyerhaeuser/Meredith agreement.

The plaintiffs' reading of this provision is also plausible as it relates to the "for any reason" clause. The problem with this interpretation is that it fails to distinguish

between two different ways in which the Weyerhaeuser/Meredith agreement could be terminated, and thus brings two otherwise consistent provisions of the Weyerhaeuser/Meredith agreement into conflict with each other. According to its terms, the Weyerhaeuser/Meredith agreement may be terminated in one of two ways. First, it may be terminated by either of the parties. Paragraph 3.1 deals with this possibility, and as the Plaintiffs correctly note, the paragraph significantly limits Weyerhaeuser's power to directly terminate the agreement. However, the Weyerhaeuser/Meredith agreement also indicates that it will terminate automatically, with or without action by the parties, if the exclusivity distributorship arrangement between A.E.R.T. and Weyerhaeuser comes to an end or subsequently precludes the continuation of Meredith's sub-distributorship.  Presumably, the paragraph 2.1 termination clause anticipates that A.E.R.T. could require changes in the A.E.R.T./Weyerhaeuser agreement that would necessitate automatic termination of the Weyerhaeuser/Meredith agreement.  Thus, paragraph 3.1 appears to apply only to a termination by direct intentional action by Weyerhaeuser, and it appears to be inapplicable to the question of whether the exclusivity changes in the 2004 A.E.R.T./Weyerhaeuser agreement served to automatically terminate the Weyerhaeuser/Meredith agreement.  An issue of material fact exists with respect to this matter, too, precluding summary judgment.

### III.   CONCLUSION

For the above reasons, The Defendant's motion for partial summary judgment (Doc. 64), and the Plaintiffs' motion for partial summary judgment (Doc. 125) are DENIED.

DONE AND ORDERED this 23rd day of September, 2005.

/s/ *Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**

Case No.: 3:04CV283/RV